IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KCD KC DISPOSAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 24-00611-CV-W-BP |
| | ) | |
| CITY OF INDEPENDENCE, MO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
(1) JUDGMENT IN FAVOR OF DEFENDANTS ON COUNT II AND
(2) DISMISSAL OF COUNT IV WITHOUT PREJUDICE**

Plaintiff is in the business of collecting and disposing of trash, refuse, and waste. In accordance with a city ordinance, it sought a Certificate of Need of Public Convenience and Necessity ("Certificate of Need" or "Certificate") from the City of Independence (the "City").[1] Its request was denied, leading to this lawsuit. The Court granted in part the City's Motion to Dismiss, (*see* Doc. 34; Doc. 45), and later granted in part the City's Motion for Summary Judgment, (*see* Doc. 66). These decisions left Counts II and IV for trial.

A bench trial was held on January 28, 2026. After considering the evidence and the parties' arguments, the Court issues the following findings of fact and conclusions of law supporting its decision to (1) enter judgment for the City on Count II and (2) dismiss Count IV without prejudice.

**I. FINDINGS OF FACT**

The following factual findings are based on the testimony and exhibits offered at trial and the Stipulation of Facts the parties filed before the trial. (*See* Doc. 78.) Where evidence conflicts,

---

[1] Plaintiff has sued (1) the City of Independence and (2) its Mayor and City Council Members in their official capacities and is seeking only equitable relief. "A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016) (quotation omitted). The Court will refer to all Defendants collectively as "the City."

it should be presumed the Court has resolved the dispute in the manner stated herein and has determined the fact in question has been established by the preponderance of the evidence. To the extent any statements in this section constitute conclusions of law they should be regarded as such.

The City does not have a solid waste disposal system; that is, it does not provide trash service for its residents and businesses, nor does it contract with a waste disposal company to provide such services. Instead, residents and businesses desiring trash service must contract with a company on their own. To operate in the City, a waste disposal company must satisfy the health and safety requirements set by both the Missouri Department of Natural Resources and the City. It also must obtain a Certificate of Need from the City.

Article 5, Chapter 19 of the City Code regulates trash haulers, and the City's requirement that a trash hauler obtain a Certificate of Need has existed for at least 40 or 50 years. Section 19.05.007 sets forth the standards for determining whether a Certificate of Need should be issued:

> In determining whether public convenience and necessity require the licensing of a proposed refuse collection service, the Council shall consider whether the public is, at the time, adequately served, the number, kind, and type of equipment, the schedule of rates proposed to be charged, whether the safe and sanitary use of the streets by the public, both vehicular and pedestrian, will be preserved, and such other facts as the Council shall consider relevant. In addition the Council may consider:
>
> 1. That insurance policies as required by City ordinances have been procured.
>
> 2. That the applicant is a fit and proper person to conduct or work in the proposed business.
>
> 3. That all the requirements of this article and all other ordinances and laws have been complied with by the applicant.
>
> 4. Whether there is more than one collection vehicle for each 1,500 residential customers, other than standby units or commercial and industrial units. This factor is merely an indicator of what has been determined to be adequate minimum service. It is a guide and not an absolute limitation.

In December 2022, Lisa Reynolds—then the City's Director of Municipal Services, but now the Deputy City Manager and Interim City Manager—gave a presentation to the City Council and the public discussing the City's regulation of trash hauling. The presentation was prompted in part by concerns about illegal dumping by citizens who had not arranged for trash service. Other matters discussed included customer service complaints (which the City could not address because trash pickup was arranged by private agreements between trash haulers and customers), and the negative effects caused by trash trucks, including street degradation, noise, and excessive heavy traffic on residential streets.

Reynolds proposed that the City adopt a solid waste program that provided trash service to all residents and businesses and presented two variations for such a plan. One called for a single trash hauler for the entire City and the other called for dividing the City into four zones with a designated hauler for each zone. City staff supported the latter option, with the cost passed on to residents and businesses in their utility bills. Part of the rationale was that if the City contracted for trash service to be provided to everyone, illegal dumping would decrease and the City would have more control over customer service matters (such as issues related to billing and missed pickups). It was further thought that by limiting service in any given area to one trash hauler, the number of trucks that would have to travel down any particular street would decrease (or at least not increase) because only one company would have to send trucks down any particular street, thereby addressing concerns related to noise, traffic congestion, and damage to the City's streets.

Public reaction to the proposal was not favorable. In response, in January 2023, the City Council adopted a resolution declaring that the City would not "grant[ ] any exclusive or limiting franchise or license to any trash hauler . . . preserving instead the right of trash and garbage haulers to freely compete and contract with individuals and businesses within the city for provision of such

3

services." (P. Ex. 8.)  No ordinances were amended and the requirement to obtain a Certificate of Need was not eliminated.

Plaintiff applied for a Certificate of Need on May 15, 2024.[2]  At the time, seven companies had Certificates; they were:

- AAA Disposal ("AAA"),
- Republic Services ("Republic"),
- GFL Environmental ("GFL"),
- Haylex, Inc., d/b/a Compost Connection ("Compost Connection"),
- Stewart Hauling ("Stewart"),
- Ted's Trash Service ("Ted's"), and
- Deffenbaugh Industries, Inc., d/b/a Waste Management ("Waste Management").

(Doc. 78, ¶ 22.)  The date each was granted a Certificate, and the number of trucks they were licensed to operate in the City, are as follows:

- AAA                  Certificate granted in 1991          16 trucks
- Republic             Certificate granted in 2000          38 trucks
- GFL                  Certificate granted in 2017           8 trucks
- Compost Connection   Certificate granted in 2008           1 truck
- Stewart              Certificate granted in 1995           1 truck
- Ted's                Certificate granted in 1993          20 trucks
- Waste Management     Certificate granted in 1991          14 trucks

---

[2] Plaintiff previously applied for a Certificate of Need in January 2023, but the application was not presented to the City Council for its consideration.  The Record does not clearly explain why it was not presented to the City Council, but the matter is not relevant to Plaintiff's claims or the Court's decision.

4

(Doc. 78, ¶¶ 26-45.)  Thus, at the time of the application, 98 trucks were licensed to haul trash in the City.[3]  Based on the City's population, this represented a ratio of 1 truck for every 523 households, well above the 1 to 1,500 ratio § 19.05.007 sets as a guideline.

At the July 1, 2024, City Council meeting, a member of the City Council (Councilman Stewart) asked City staff to prepare an amendment to Article 5, Chapter 19, that limited the number of Certificates of Need that could be issued based on the City's population.  (P. Exhibits 48 and 49.)  Councilman Stewart also expressed that he wanted the amendment to protect those haulers with Certificates if the population dropped.  (P. Exhibits 46, 47, and 50.)  There is no evidence addressing whether Councilman Stewart knew about Plaintiff's application.

The proposed amendment prepared by City staff at Councilman Stewart's request— Ordinance No. 19596—begins with three clauses stating the following:

> WHEREAS, the City . . . has regulated trash collection since the 1940s; and may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws; and
>
> WHEREAS, since the adoption, there have been several amendments to the refuse collectors article mostly dealing with singular topics; and
>
> WHEREAS, [the] City Council desires to update these regulations to enact a maximum number of refuse collectors that can operate in the City.

Ordinance No. 19596 then amends § 19.05.002 to add the following after the requirement that a Certificate of Need be obtained: "[n]o [Certificate of Need] shall be approved where . . . the total number of such establishments operating within the City of Independence will exceed the population density factor of one refuse collection establishment per 17,500 residents based on the

---

[3] The number of trucks is reflected in the trash haulers' business licenses.  At the beginning of the trial, the Court inquired whether these numbers constituted legally enforceable limits.  Plaintiff's counsel represented that there is no legally enforceable cap on the number of trucks a hauler can utilize, and the City's counsel said that there would be evidence on the issue.  However, there was no evidence on this issue, and at the end of the trial the City's counsel conceded that there is no legally enforceable limit.

5

last decennial census." Under this formula, 7.0292 Certificates of Needs could be approved, and the City had already approved seven.[4] However, as will be discussed below, Ordinance No. 19596 was not in effect when the City Council considered Plaintiff's application.

Plaintiff's application was considered at a City Council meeting on August 19, 2024. City staff recommended that the application be denied "because adding another trash hauler would put the number of trash vehicles 'although slightly' further away from the guideline outlined in the City Code." (Doc. 78, ¶ 63.) In all other respects, Plaintiff's application met the City Code's requirement. The City Council voted to deny Plaintiff's application.

At the same meeting, after the City Council denied Plaintiff's application, Ordinance No. 19596 had its second reading and was adopted by the City Council; it went into effect ten days later. Therefore, Ordinance No. 19596 did not provide a legal impediment to Plaintiff's application.[5] If Plaintiff files a new application today, however, Ordinance No. 19596 would require that it be denied because the City's population has not increased to the point that an eighth Certificate can be issued.

Plaintiff's Complaint generally challenges the requirement that it obtain a Certificate of Need and also focuses on two aspects of the criteria the City Ordinances set forth that limit the issuance of a Certificate. The first of those criteria was applied to Plaintiff's 2024 application; it is § 19.05.007.4's instruction that the City Council consider "[w]hether there is more than one collection vehicle for each 1,500 residential customers, other than standby units or commercial and industrial units." Section 19.05.007.4 states this figure is "merely an indicator of . . . adequate

---

[4] Some of the Exhibits state the City had granted eight Certificates of Need, but other evidence establishes that this was an error.

[5] Councilman Stewart said he was voting to deny Plaintiff's application because he anticipated that Ordinance No. 19596 would pass. There is no evidence regarding the other council members' reasoning, but had the City Council granted Plaintiff's application, by its terms Ordinance No. 19596 would not have required that Plaintiff's Certificate be rescinded.

6

service" and is intended as "a guide and not an absolute limitation."  The second criterion Plaintiff challenges is the additional provision added by Ordinance No. 19596, which limits the number of Certificates that can be issued based on the City's population.  For ease of discussion, the Court will refer to the criteria collectively as "the Ordinance," and will refer to them as "§ 19.05.007.4" or "Ordinance No. 19596" when it is necessary to refer to them individually.

Plaintiff's Complaint asserted four claims:

Count I          Violation of the Sherman Act (15 U.S.C. § 1),

Count II         Violation of the Dormant Commerce Clause,

Count III        Violation of Due Process (substantive and procedural) and Equal Protection, and

Count IV        Request for Judicial Review of the City's Decision under state law.

The Court granted the City's Motion to Dismiss in part, dismissing Count III to the extent it asserted a procedural Due Process and an Equal Protection Claim.  The Court later granted the City's Motion for Summary Judgment in part, granting it summary judgment on the antitrust and substantive Due Process claims.  This left Counts II and IV for resolution.

## II.  CONCLUSIONS OF LAW

The Court's prior Orders addressed many of the legal issues that must be discussed, and the Court may quote its prior Orders without attribution.  To the extent that any statements in this section constitute factual findings (as opposed to legal conclusions), they should be construed as such.

### A.  Count II – Dormant Commerce Clause

The Commerce Clause, U.S. Const. art. I, § 8, cl. 3, grants Congress the power to regulate interstate commerce.  "The dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate

7

Case 4:24-cv-00611-BP     Document 87     Filed 02/23/26     Page 7 of 15

commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003). "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Department of Revenue of KY v. Davis*, 553 U.S. 328, 337-38 (2008) (quotation omitted); *see also National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). Despite this being the dormant Commerce Clause's primary concern, it can be violated even if a law does not discriminate against interstate commerce.

To determine whether a law violates the dormant Commerce Clause, the Court must "first ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* (quotation omitted); *see also IESI AR Corp. v. Northwest Arkansas Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006); *Hazeltine*, 340 F.3d at 593. A law may demonstrate such discrimination "on its face, in its purpose, or through its effects." *LSP Transmission Holdings, LLC. v. Sieben*, 954 F.3d 1018, 1027 (8th Cir. 2020) (quotation omitted); *see also SDDS, Inc. v. State of South Dakota*, 47 F.3d 263, 267 (8th Cir. 1995). The Court has previously concluded that the Ordinance does not discriminate against interstate commerce, and it adheres to that decision. [6]

---

[6] In summary: the Ordinance acts in exactly the same manner and has exactly the same effects regardless of whether (1) a trash hauler is in the state of Missouri or in another state or (2) the trash is to be hauled from the City to a place in the state of Missouri or a place outside of it. *E.g.*, *CTS Corp. v Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) ("The Indiana Act . . . has the same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana. Thus, it visits its effects equally upon both interstate and local business." (quotation omitted)). There also was no evidence that the Ordinance has a discriminatory purpose or effect. To the contrary, while there was no evidence establishing where the current Certificate holders transport the trash they pick up, at least one of the current Certificate holders is located in Kansas.

8

"[E]ven if a law does not overtly discriminate against interstate commerce, the law will be stricken if the burden it imposes upon interstate commerce is clearly excessive in relation to the putative local benefits." *LSP Transmission*, 954 F.3d at 1026 (quotation omitted). This analysis is based on the Supreme Court's decision in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Pike* "requires balancing a legitimate local public interest against its incidental burden on interstate commerce," and "[a] regulation will be invalidated only when 'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *IESI AR Corp.*, 433 F.3d at 606 (quoting *Pike,* 397 U.S. at 142; all other citations omitted).

To the extent Plaintiff argues that requiring a Certificate of Need amounts to a per se violation of the dormant Commerce Clause, it is incorrect. The cases it cited involved certificates of need that discriminated against interstate commerce, *e.g.*, *Buck v. Kuykendall*, 267 U.S. 307 (1925); *Truesdell v. Friedlander*, 80 F.4th 762 (6th Cir. 2023),[7] or that failed to pass muster under *Pike*. *E.g.*, *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560 (4th Cir. 2009). Certificate of need requirements that do not discriminate are upheld if they satisfy *Pike*'s balancing test. *E.g.*, *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 155-57 (4th Cir. 2016); *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 398-401 (9th Cir. 1995). Therefore, having concluded the Ordinance does not discriminate against interstate commerce, the Court proceeds to the *Pike* analysis.

"[T]he rule in *Pike* [holds] that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local

---

[7] In *Buck*, the State of Washington prohibited interstate transportation along the Pacific Highway unless the carrier obtained a certificate of need, but such a requirement was not imposed for intrastate transportation. *Buck*, 267 U.S. at 312-13. In *Truesdell*, Kentucky restricted ambulance services taking patients from Kentucky to other states but imposed no restrictions on ambulance services transporting patients from other states into Kentucky, or between points within the state. *Truesdell*, 80 F.4th at 777-78. The discussions in those cases confirm that they address discrimination (*i.e.*, different treatment) between intrastate and interstate transportation.

9

practice." *Davis*, 553 U.S. at 353; *see also National Pork Prods.*, 598 U.S. at 392 (Sotomayor, J., joined by Kagen, J, concurring in part); *id.*, 598 U.S. at 393-94 (Barrett, J., concurring in part); *id.*, 598 U.S. at 396 (Roberts, C.J., joined by Alito, Kavanaugh, and Jackson, JJ., concurring in part and dissenting in part). Under *Pike*, a "law will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. State laws frequently survive this *Pike* scrutiny, though not always, as in *Pike* itself." *Davis*, 553 U.S. at 338-39 (2008) (cleaned up); *see also LSP Transmission*, 954 F.3d at 1031 (observing that the Supreme Court has "rarely" relied on *Pike* to invalidate a regulation).

First, the Court considers the Ordinance's purpose and the benefits the City hoped to achieve from it.[8] The Ordinance as a whole, and (1) § 19.050.007.4's guidance regarding the number of trucks that should be approved and (2) Ordinance No. 19596's limit on the number of Certificates that can be issued, are intended to limit the number of trucks that travel on the City's streets At least one of the purposes of these limits is to minimize damage to the streets and address citizen concerns regarding noise and traffic congestion. These are valid interests for the City to address through legislation. The City does not have to prove the benefits it hopes to achieve became a reality. "[U]nder *Pike,* it is the *putative* local benefits that matter. It matters not whether

---

[8] The Court has previously held that in evaluating the Ordinance's purpose and benefits, it must consider the purpose and benefits that motivated its adoption. (*E.g.*, Doc. 66, pp. 12-13.) This contrasts with rational basis review under the Due Process Clause, which does not require evidence about the legislative body's actual rationale and requires that a law be upheld if there is a plausible, conceivable justification for it. (*See* Doc. 66, pp. 14-16.) Plaintiff has argued the Court can consider only the Ordinance itself when determining its purpose and benefits, but this is incorrect. First, the cases Plaintiff cites address how to ascertain legislative intent for purposes of determining what a statute means and how it applies, and in that context, it is well-established that legislative intent is revealed in the language of the laws that are enacted. Plaintiff cites no authority for the proposition that the Court is limited to a statute's or ordinance's language when ascertaining its purpose and benefits as part of a dormant Commerce Clause analysis. Second, prior decisions confirm the Court is not limited in that manner; information not contained in legislation is frequently considered for these purposes. *E.g.*, *National Pork Products*, 598 U.S. at 366-67; *United Haulers Ass'n*, 550 U.S. at 335-37; *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 121 (1978). Courts also consider facts outside the legislation's language when ascertaining, at the first step of the analysis, whether it is intended to discriminate against interstate commerce, *e.g.*, *Jones v. Gale*, 470 F.3d 1261, 1269 (8th Cir. 2006); *South Dakota Farm Bureau*, 340 F.3d at 593-995, and if such evidence can be used at the first step (where more scrutiny is called for), it makes no sense to hold it cannot be used at the second, more lenient, step as well.

10

these benefits actually come into being at the end of the day." *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005) (emphasis in original); *see also National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1155-56 (9th Cir. 2012). Nonetheless, the Ordinance is reasonably calculated to achieve the intended benefits. Clearly, a guideline regarding the number of trucks is directly related to the issues the City intended to address. A limit on the number of trash haulers operating in the City can also be expected to limit the number of trucks. With seven companies possessing Certificates of Need, it is conceivable that seven different trucks will have to travel down any particular street. If another company is granted a Certificate—and if some customers switch to the new company—an eighth truck will have to use that street. And while the City does not limit the number of trucks each company can use, the City is entitled to reasonably expect that trash haulers will not use more trucks than are necessary. Thus, the Ordinance as a whole and these provisions specifically help achieve the legitimate purposes of limiting the costs and burdens associated with having numerous trash trucks in the City.

The Court must weigh these benefits against the burden on interstate commerce. Initially, it is not clear that there is such a burden. Plaintiff insists there is, and the Court admits it seems intuitive to conclude interstate commerce is burdened when a municipality limits the number of businesses that can operate within its geographic limits. Nonetheless, establishing a burden—and the magnitude of that burden—requires evidence. As the Seventh Circuit put it:

> Any balancing approach, of which *Pike* is an example, requires evidence. It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits. Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.

*Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008) (quotations and citations omitted); *see also United Haulers*, 550 U.S. at 346; *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1043-44 (10th Cir. 2009)

11

(quoting *Baude*). The burden on interstate commerce is not established simply by demonstrating a business (such as Plaintiff) is either located outside Missouri or intends to transport the City's trash outside the state. "When evaluating the ordinance's impact upon interstate commerce, we must ascertain what effect would arise if not one, but many or every jurisdiction adopted similar legislation." *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1071 (8th Cir. 2000) (cleaned up). Other cases confirm that whether a burden exists depends on whether, in the aggregate, interstate commerce is limited. *E.g.*, *LSP Transmission*, 954 F.3d at 1031; *IESI AR Corp. v. Northwest Arkansas Reg'l Solid Waste*, 433 F.3d 600, 606 (8th Cir. 2006); *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978). A burden on interstate commerce is not established simply with evidence about the Ordinance's effect on Plaintiff.

Regardless, assuming there is *some* burden on interstate commerce (because, intuitively, there may be other trash haulers who (1) are outside Missouri or (2) want to transport trash from the City to a place outside the state), the burden is not clearly excessive in comparison to the benefits discussed above. Under this analysis, even if "a law that burdens interstate commerce serves some legitimate local purpose, the availability of a less burdensome alternative is relevant to the inquiry that *Pike* requires." *U & I Sanitation*, 205 F.3d at 1070. Plaintiff argues there are other ways for the City to accomplish its objectives, including by (1) "limiting the number of trucks each hauler can operate," (2) establishing efficiency standards for trucks, (3) scheduling the days in which companies serve various streets or the routes they use, or (4) "limiting the number of times per week a trash truck can service a particular address, street or neighborhood." (Doc. 77, p. 9.) But Plaintiff offered no evidence establishing that these measures would be any less burdensome on interstate commerce than the Ordinance. In fact, Plaintiff specifically suggests the City can limit the number of trucks operating in the City—which is more limiting and thus at least

12

as burdensome as the guidance set forth in § 19.05.007. Even a requirement that certain types of trucks be used presents burdens (in the form of compliance costs) that must be considered under *Pike*. *See, e.g., National Pork Producers*, 598 U.S. at 398-99 (Roberts, C.J., concurring in part and dissenting in part).[9] Plaintiff has not demonstrated that the alternatives it suggests are any less burdensome on interstate commerce than the Ordinance.

In conclusion, the Ordinance does not discriminate against interstate commerce on its face, in its purpose, or through its effects. Therefore, it survives scrutiny under the dormant Commerce Clause unless its burdens clearly outweigh its benefits. Plaintiff did not establish the existence or extent of any burdens on interstate commerce; regardless, any burdens that might exist are not clearly outweighed by the Ordinance's benefits.

## B. Request for Judicial Review

Count IV asks the Court to review Plaintiff's application for a Certificate of Need under the Missouri Administrative Procedures Act, § 536.150 of the Revised Statutes of Missouri. Section 536.150 permits review of the City's decision and in that review a court "may hear such evidence on such question as may be properly adduced" and decide whether the City's action was "unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involve[d] an abuse of discretion . . . ." Mo. Rev. Stat. § 536.150.1. The Court previously expressed concern about "the difficulties involved in having a federal court either (1) conduct an independent review of a license application or (2) review a city council's discretion," and directed Plaintiff to explain why the Court should not decline supplemental jurisdiction over Count IV. (Doc. 34, p. 15.)[10] Plaintiff

---

[9] This portion of Justice Roberts's opinion was supported by a majority of the Justices.

[10] There is not an independent basis for jurisdiction over Count IV; it is a state claim, Plaintiff has never argued that diversity of citizenship exists, and the parties' stipulation suggests it does not because some of Plaintiff's members are residents of Missouri. (Doc 78, ¶ 52; *see also* Doc. 34, pp. 15-16.)

explained that Count IV was intended primarily as a mechanism for providing relief if the Court found the City's decision violated federal law as alleged in Counts I, II, and III. Plaintiff also acknowledged that if the City prevailed on Counts I, II, and III, "there would be no federal claims remaining, and the Court would determine whether to continue to exercise supplemental jurisdiction after all federal claims were dismissed, for which there is a separate analysis for exercising supplemental jurisdiction." (Doc. 38, p. 7.) The Court relied on this explanation to continue exercising supplemental jurisdiction over Count IV:

> Plaintiff explains that "[t]he crux of [its] administrative review claim is that the City's denial of the license was 'unlawful' because it violated the Sherman Act and was 'unconstitutional' because the denial violated the Commerce Clause and [Plaintiff's] right to substantive due process under the Due Process Clause." (Doc. 38, p. 1.) *Viewed in this light, Plaintiff's success on Count IV depends solely on its success on Counts I, II, and III; if the City prevails on any of the federal claims, it necessarily prevails on Count IV because a ruling for Plaintiff on Counts I, II, or III would establish the City's actions were unlawful or unconstitutional.*

(Doc. 45, p. 3 (emphasis added).) The Court also acknowledged Plaintiff's concession that "if it does not prevail on any federal claims—at which point Count IV might require a review of the City's discretion—the Court can decide then to decline supplemental jurisdiction over the state claim." (Doc. 45, p. 3.)

Despite this, Plaintiff asks the Court to determine that the City's decision was arbitrary and capricious. (Doc. 77, p. 10.) The Court declines to exercise supplemental jurisdiction over Count IV to conduct this inquiry. Here, several exceptions to the exercise of supplemental jurisdiction apply. Because § 536.150 permits a court to consider and reweigh evidence and review the merits of the City's decision, it raises complex issues of state law. *See* 28 U.S.C. § 1367(c)(1). Those same circumstances provide compelling reasons to decline jurisdiction, because § 536.150 requires a court to reweigh the City's policy decisions. *See id*. § 1367(c)(4). Finally, and most importantly, the Court has dismissed all claims over which it had original jurisdiction, which alone is sufficient

14

reason to decline supplemental jurisdiction. *See id*. § 1367(c)(3). Therefore, Count IV will be dismissed without prejudice.

### III.  CONCLUSION

For the reasons set forth above, the Court enters judgment in favor of Defendants on Count II and dismisses Count IV without prejudice.

**IT IS SO ORDERED.**

/s/ Beth Phillips<br>BETH PHILLIPS, JUDGE<br>UNITED STATES DISTRICT COURT

**DATE**:  February 23, 2026